**CAPITAL INFORMATION GROUP, a
sole proprietorship, and Gregg Er-
ickson, individually, Appellants,**

v.

**STATE of Alaska, OFFICE OF the GOV-
ERNOR, a unit of the executive branch
of state government, Kris W. Lethin, in-
dividually and in his capacity as Legisla-
tive Liaison to the Governor; Shelby
Stastny, individually and in his capacity
as Director of the Office of Management
and Budget in the Office of the Gover-
nor; and Patrick P. Ryan, individually
and in his capacity as Chief of Staff to
the Governor, Appellees.**

No. S–6443.

Supreme Court of Alaska.

Aug. 16, 1996.

---

Jeffrey W. Bush, Juneau, Douglas Pope, Pope & Katcher, Anchorage, for Appellants.

Barbara J. Ritchie, Deputy Attorney General, Bruce M. Botelho, Attorney General, Juneau, for Appellees.

Before RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

MATTHEWS, Justice.

## I. INTRODUCTION

This case involves a news publisher's claim that the Governor and the executive branch are unlawfully withholding documents from the public. The superior court held that the

documents were protected by the deliberative process privilege. The publisher appeals that decision, as well· as the superior court judge's refusal to disqualify himself.[1]

## II. *FACTS AND PROCEEDINGS*

The Capital Information Group (CIG) is a news organization that publishes periodicals describing the activities of the Alaska state government. It is owned by Judy Erickson, appellant Gregg Erickson's wife.

Gregg Erickson is the editor of one of CIG's publications, the Alaska Budget Report (ABR). In Erickson's words, ABR covers "the action of the legislature and the administration on budget spending and revenue, and specifically ... cover[s] the activities of the finance committees, OMB, and the governor's office as they relate to the formulation and adoption of the spending and collecting of state money." During the legislative session, ABR is published weekly; it is published once every two months during the rest of the year. Approximately twenty to twenty-five groups subscribe to ABR, including news and media organizations, government agencies, lobbyists, legislators, corporations, non-profit organizations, and local governments.

Since its inception in 1986, CIG has received information for its newsletters directly from the government by making verbal requests. Until Erickson sought the information that is the subject of this suit, the government usually complied.

At issue in this case are two sets of documents. The first set of documents consists of the budget proposals sent from each executive department commissioner to the Office of Management and Budget (OMB). In the summer of 1993, the Governor began working on his proposed 1995 operating budget. To facilitate this work, OMB director Shelby Stastny sent to the commissioner of each state department a memorandum which stated:

> [E]ach department's [fiscal year 1995 ("FY 95") ] operating budget will reflect the

funding level set early in the budget process. To develop this level for FY 95, the Governor will provide each commissioner with an allocation. You will then prepare a memorandum in which you will discuss the programmatic impact the allocation will have on services which the department is providing this current fiscal year. In addition, the memorandum should briefly discuss any potential legislation which could be important in meeting the department's FY 95 obligations.

The second set of documents contains each department's proposals for new legislation sent to the Governor's Legislative Liaison. During the summer of 1993 the Governor was also preparing the legislation he would introduce during the 1994 legislative session. To facilitate this, his Legislative Liaison, Kris Lethin, sent each department commissioner a letter requesting proposals for legislation.

Erickson, after learning of Stastny's request, wished to examine the correspondence from each department commissioner to OMB regarding the budget. He also requested from Lethin the legislation proposed by each department commissioner. When his verbal requests went unanswered, Erickson made a written request for this information. Both Stastny and Lethin, on the advice of the Department of Law, denied Erickson's requests. Stastny provided Erickson with the letter he sent each commissioner, and the spreadsheet used to provide each department with an initial budget target. He claimed all other documents regarding the budget were protected by the deliberative process privilege. Lethin also claimed that all documents pertaining to proposed legislation were protected by the deliberative process privilege.

Erickson appealed the denials to the Governor's Chief of Staff, but the denials were upheld, based on the deliberative process privilege. In response, CIG filed this suit. CIG requested declaratory and injunctive relief, as well as punitive damages. CIG also filed a motion for a preliminary injunction or partial summary judgment requesting imme-

---

1. The State's cross-appeal, which argued that the superior court erred in holding the appellant to be a public interest litigant, was dismissed on

July 25, 1995, pursuant to the parties' agreement.

diate access to the documents in question. The superior court denied CIG's motion as well as a motion for reconsideration; this court denied a petition for review of those orders. Case No. S–6057. CIG then amended its complaint and added a claim for compensatory damages for lost business.

Shortly after its motion for a preliminary injunction was denied, CIG filed a motion requesting Judge Pegues to disqualify himself under Alaska Code of Judicial Conduct, Canon 3C(1)(a) and (b). Judge Pegues denied this motion, as did Judge Thomas M. Jahnke upon review under AS 22.20.020(c).

The court entered an order requiring that the State submit the records requested by CIG. The State submitted the documents for *in camera* review. The State and CIG then filed cross-motions for summary judgment, although CIG's motion was only for partial summary judgment, reserving the issue of damages. The superior court granted the State's motion for summary judgment based on the deliberative process privilege, and denied CIG's cross-motion for partial summary judgment. CIG appeals both the summary judgment order and Judge Pegues's refusal to disqualify himself.

### III. *DISCUSSION*

A. *Did the Superior Court Err in Finding that the Documents in Question Were Protected by the Deliberative Process Privilege?* [2]

1. *The Alaska public records statute*

■ Alaska's public records statute, AS 09.25.100–220, states that, "[u]nless specifically provided otherwise, the public records of all public agencies are open to inspection by the public under reasonable rules during regular office hours." AS 09.25.110(a). The statute also states that "[e]very person has a right to inspect a public record ... except ... (4) records required to be kept confidential by a federal law or regulation or by state law." AS 09.25.120(a).

In the most recent amendment to the statute, the legislature added a legislative find-

ings and intent section. The legislature stated that "public access to government information is a fundamental right that operates to check and balance the actions of elected and appointed officials and to maintain citizen control of government." Ch. 200, § 1, SLA 1990.

■ This court has interpreted the statute several times, and has repeatedly articulated that exceptions to the disclosure requirement should be construed narrowly to further the legislature's goal of broad public access. *Municipality of Anchorage v. Anchorage Daily News,* 794 P.2d 584, 589 (Alaska 1990); *Doe v. Alaska Superior Court,* 721 P.2d 617, 622 (Alaska 1986). We have, however, recognized that an "executive privilege" may, in some cases, require that a record be kept confidential. *Doe,* 721 P.2d at 622–23. At issue in this case is whether the requested documents are exempted from the general public disclosure requirements under the deliberative process privilege.

2. *The deliberative process privilege*

■ The deliberative process privilege "is a widely recognized confidentiality privilege asserted by executive officials. It rests on the ground that public disclosure would deter the open exchange of opinions and recommendations between government officials .... [and] is intended to protect the executive decision-making process, its consultative functions, and the quality of its decisions." Natalie A. Finkelman, Note, *Evidence and Constitutional Law,* 61 Temp.L.Rev. 1015, 1033 (1988).

■ This court has never explicitly adopted the deliberative process privilege by that name. We have, however, accepted the "executive privilege" articulated in *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), which encompasses the same policy concerns. *Doe,* 721 P.2d at 622–23. This privilege "recognizes that a chief executive has a qualified power to keep confidential certain internal governmental communications so as to protect the

---

**2.** Both parties correctly note that whether a privilege applies is a question of law which this court reviews without deference to the trial court.

*Jones v. Jennings,* 788 P.2d 732, 735 (Alaska 1990).

deliberative and mental processes of decisionmakers." *Id.* Thus, the term "executive privilege" in *Doe* encompasses what other commentators have called the deliberative process privilege. We consider the terms to be synonymous for purposes of this discussion.[3]

The origin of the deliberative process privilege can be summarized as follows:

> The deliberative process privilege itself can be directly traced to 'two relatively recent decisions. In 1938 the Supreme Court protected the mental processes of government decisionmakers in *Morgan v. United States* [304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129]. Then, in 1958 Justice Reed built on *Morgan* when, sitting on the Court of Claims by designation, he decided *Kaiser Aluminum & Chemical Corp. v. United States* [141 Ct.Cl. 38, 157 F.Supp. 939]. Justice Reed considered in *Kaiser* whether internal government documents must be disclosed. He recognized the need for open, frank discussions among government officials about proposed or contemplated action. He believed disclosure of official deliberations would inhibit those discussions, invade the mental processes of government officials, and adversely affect the quality of administrative decisionmaking. Accordingly, he held that a document containing deliberative process information was privileged and need not be disclosed.

Russell L. Weaver & James T.R. Jones, *The Deliberative Process Privilege*, 54 Mo.L.Rev. 279, 286–88 (1989) (footnotes omitted) (hereinafter Weaver & Jones).

A limited deliberative process privilege, labeled the "executive privilege," was adopted by the United States Supreme Court in *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Unlike the common law based deliberative process privilege discussed above, the executive privilege in *Nixon* was deemed constitutionally required by the separation of powers doctrine. The Court explained the privilege, and its constitutional underpinnings, by stating:

> The expectation of a President to the confidentiality of his conversations and correspondence, like the claim of confidentiality of judicial deliberations, for example, has all the values to which we accord deference for the privacy of all citizens and, added to those values, is the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking. A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. These are the considerations justifying a presumptive privilege for Presidential communications. The privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution.

*Id.* at 708, 94 S.Ct. at 3107. Notwithstanding this strong language, the Court held that the privilege was limited, and that the information would not immediately become public, but would be produced "for *in camera* inspection with all the protection that a district court will be obliged to provide." *Id.* at 706, 94 S.Ct. at 3107.

In *Doe v. Alaska Superior Court*, 721 P.2d 617 (Alaska 1986), this court cited *Nixon* and

---

3. We do not address potential distinctions between the two terms in other contexts. *See, e.g.,* 26A Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5680, at 125 (1992) (stating deliberative process privilege has been known by variety of names, including executive privilege); Stephen G. Lee, *We Have Ways of Making You Talk: Challenging the Invocation of the Deliberative Process Privilege in Contract Disputes*, 40 Fed.B. News & J. 90, 90 (1993) (calling deliberative process privilege a "form of executive privilege"); Margot O. Knuth, *Inspection and Discovery of State Records in Alaska*, 4 Alaska L.Rev. 277, 277 n. 3 (1987) (stating most courts use "executive privilege" to refer to "deliberative process privilege" although "executive privilege" may also refer to narrower privilege); Gerald Wetlaufer, *Justifying Secrecy: An Objection to the General Deliberative Privilege*, 65 Ind. L.J. 845, 845 n. 1 (1990) (describing "general deliberative privilege" as having different names, sometimes "an undifferentiated part of a larger cluster of privileges, usually either the 'executive privilege' or the 'official information privilege' ...." (citations omitted)); Russell L. Weaver & James T.R. Jones, *The Deliberative Process Privilege*, 54 Mo.L.Rev. 279, 279 (1989) (calling "deliberative process privilege" a "branch of the executive privilege.").

held that the Alaska Constitution's separation of powers doctrine supported a governor's claim of executive privilege. *Id.* at 623. In *Doe*, Governor Hammond was considering appointing Dr. Carolyn Brown to the State Medical Board. *Id.* at 619. Although the Governor never sent a prepared letter appointing Brown, the press secretary announced the appointment. *Id.* In response, an anti-abortion group published an article in its newsletter urging readers to send protest letters to the Governor. *Id.* Soon after, the Governor sent Brown a letter stating that the announcement of her appointment was an error. *Id.*

Brown and other doctors identified in the newsletter sued the anti-abortion organization for defamation. As part of discovery, the doctors requested the Governor's "appointment file" which contained letters and telegrams received by the Governor, the Governor's responsive letters, and miscellaneous internal memorandum and papers. *Id.*

■ In deciding *Doe,* we first noted that exceptions to the public records statute's disclosure requirements are to be construed narrowly. *Id.* at 622. We then adopted the executive privilege as a privilege required under the Alaska Constitution's Separation of Powers Doctrine, stating: "We ... conclude that the public policy rationale upon which the Supreme Court relied in *United States v. Nixon* is equally applicable to our state government." *Id.* at 623. We addressed the letters from private citizens and the internal memoranda and papers separately in light of the privilege.

Regarding the citizen letters, we noted that most state courts only restrict public access to *"internal* communications stating the opinions and recommendations of state employees, or information directly *solicited*

by government officials." *Id.* at 625 (emphasis in original). We followed this rule because "[i]n such cases the rationale underlying the executive privilege doctrine—the need to encourage candid opinions and debate among government officials during the decision-making process—is directly applicable." *Id.* In contrast, we held that the rationale underlying executive privilege did not apply to citizens' letters and such letters were not protected. *Id.*

Regarding the internal memorandum and papers, we held that they were covered by the executive privilege. We noted that some of the documents at issue in *Doe* were internal communications that might contain advisory opinions and recommendations. *Id.* at 625. Because opinions and recommendations "constitute the type of internal deliberative communication the privilege is designed to protect," we remanded to the superior court to determine whether the documents were protected. *Id.*

On remand, the government was instructed to "specifically identify and describe the documents sought to be protected and explain why they fall within the scope of the executive privilege." *Id.* at 626. The party seeking disclosure would then have to show that "the need for production outweighs the interest in confidentiality." *Id.*

■ Authorities generally agree upon the substantive requirements of the deliberative process privilege. Initially, since we are concerned with protecting open and free discourse among governmental decisionmakers, the communication at issue must be predecisional to be protected. *Doe,* 721 P.2d at 624 n. 10 (citation omitted). *See also Senate of Puerto Rico v. United States Dep't of Justice,* 823 F.2d 574, 585 (D.C.Cir.1987); Weaver & Jones at 290–95.[4] Postdecisional com-

4. We consider cases dealing with the Freedom of Information Act, 5 U.S.C. § 552, and its "Exemption 5" instructive as they relate to the deliberative process privilege. *See Doe,* 721 P.2d at 624, n. 10. Section 552(b)(5) exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." Thus, the exemption incorporates common law privileges into the statute. It is through FOIA, then, that federal courts frequently address the deliberative process privilege.

*See, e.g., Senate of Puerto Rico,* 823 F.2d at 584–85 ("[D]ocuments covered by ... the 'deliberative process' privilege are unquestionably exempt from FOIA disclosure."); *Bureau of Nat'l Affairs v. United States Dep't of Justice,* 742 F.2d 1484, 1496–97 (D.C.Cir.1984) ("Among the privileges covered by Exemption 5 is the executive privilege regarding the government's deliberative process.... The purpose of Exemption 5 is 'to protect the deliberative process of the government, by ensuring that persons in an advisory

munications are not protected; however, a predecisional communication does not automatically lose the privilege after the decision has been made, for fear that even disclosure of past communications could harm future deliberations. Weaver & Jones at 290–92. Each case must be considered independently and on its own merits. *Id.* at 292.

■ The second requirement for the privilege to attach is that the communication be " 'deliberative' in nature, reflecting the 'give-and-take' of the deliberative process and containing opinions, recommendations, or advice about agency policies." *Doe,* 721 P.2d at 624 n. 10 (quoting *Paisley v. C.I.A.,* 712 F.2d 686, 698 (D.C.Cir.1983), *vacated in part on other grounds,* 724 F.2d 201 (D.C.Cir.1984)). *See also Senate of Puerto Rico,* 823 F.2d at 585; Weaver & Jones at 296. Concomitant with this requirement, purely factual material is not protected, and must be disclosed unless "the manner of selecting or presenting those facts would reveal the deliberative process, or if the facts are 'inextricably intertwined' with the policymaking process." *Paisley,* 712 F.2d at 699 (citations omitted); *see also* Weaver & Jones at 297.

■ If a communication is not shown to be both predecisional and deliberative, then the public records statute applies and the document will likely be disclosed. If the communication meets the threshold test, however, the inquiry is not yet over:

Once the court determines that a document is privileged, it must still determine whether the document should be withheld. Unlike some other branches of the executive privilege, the deliberative process privilege is a qualified privilege. Once the agency demonstrates that documents fit within it, the burden shifts to the party seeking disclosure. It must demonstrate that its need for the information outweighs the regulatory interest in preventing disclosure.

Weaver & Jones at 315 (citations omitted).

■ We have previously outlined the balancing test that must be performed when a person seeks records under the public rec-

ords statute in the face of executive officials' claims of secrecy. In *City of Kenai v. Kenai Peninsula Newspapers, Inc.,* 642 P.2d 1316 (Alaska 1982), we stated:

In general, questions such as these require a balance to be struck between the public interest in disclosure on the one hand and the privacy and reputation interests of the affected individuals and the government's interest in confidentiality, on the other. The process of balancing has been described as follows:

In determining whether the records should be made available for inspection in any particular instance, the court must balance the interest of the citizen in knowing what the servants of government are doing and the citizen's proprietary interest in public property, against the interest of the public in having the business of government carried on efficiently and without undue interference.

. . . .

In balancing the interests referred to above, the scales must reflect the fundamental right of a citizen to have access to the public records as contrasted with the incidental right of the agency to be free from unreasonable interference. The citizen's predominant interest may be expressed in terms of the burden of proof which is applicable in this class of cases; the burden is cast upon the agency to explain why the records sought should not be furnished. Ultimately, of course, it is for the courts to decide whether the explanation is reasonable and to weigh the benefits accruing to the agency from non-disclosure against the harm which may result to the public if such records are not made available for inspection.

*Id.* at 1323 (quoting *MacEwan v. Holm,* 226 Or. 27, 359 P.2d 413, 421–22 (1961) (en banc)). *See also Municipality of Anchorage v. Daily News,* 794 P.2d 584, 590–91 (Alaska 1990).

This "balancing test" was articulated in the absence of any official assertion of a delibera-

---

role would be able to express their opinions freely to agency decisionmakers without fear of

publicity [that might] . . . inhibit frank discussion . . . .' ") (citations omitted).

tive process privilege. But the balancing test as described goes a long way toward accomplishing the goals of the qualified privilege. If the government does not make a justifiable claim to confidentiality, then the balance will almost certainly tip in favor of the individual seeking the information. If it does make such a claim, and meets the threshold requirements, then there is a presumptive privilege and the party seeking disclosure must make a sufficient showing that the need for production outweighs the need for secrecy. *Doe,* 721 P.2d at 626. The deliberative process privilege affects the balance described above primarily by identifying more specifically what interest the government may have in maintaining confidentiality, in the form of the threshold showing that the communication is predecisional and deliberative. It also outlines fairly rigid procedural requirements ·that the government must meet in order to claim the privilege. *See Doe,* 721 P.2d at 626.

Thus, the balancing test that a court should perform where a presumptive privilege attaches is that of *City of Kenai,* If the privilege attaches, however, instead of there being a presumption in favor of disclosure, with doubtful cases being resolved by permitting public inspection, *see City of Kenai,* 642 P.2d at 1323, there is a presumption in favor of nondisclosure and the party seeking access to the document must overcome that presumption.

3. *The applicability of the deliberative process privilege to the documents CIG seeks*

■■■■ CIG's points on appeal and brief ask for disclosure of two specific types of documents. First, "[r]ecords in the form of legislative proposals recommended by the various departments and agencies of the state for introduction by the Governor." Second, "memoranda prepared by the heads of various agencies and departments of state government for and generally at the request of the director of the Office of Management and Budget regarding the potential impacts of various budget proposals." [5]

a. *Legislative proposals*

■■■ The first set of documents CIG seeks are legislative proposals sent directly to. the Governor. The legislative proposals were clearly predecisional. The Governor requested them to aid him in deciding what legislation to propose to the legislature; the decision was his. CIG's claim that they were not predecisional because they were each agency's final decision is without merit. *See Bureau of Nat'l Affairs v. United States Dep't of Justice,* 742 F.2d 1484, 1497 (D.C.Cir.1984) (agency proposals predecisional where final decision is President's).

Second, the proposals were deliberative. CIG argues that they are not deliberative because they "do not memorialize any debate or discussion between members of the Governor's staff, or between the Governor and his chief advisors, but rather constitute reports made by the agencies to the Governor's office upon request." As such, CIG claims they are not "in the nature of internal give-and-take recommendations between decision-makers that would be potentially subject to the deliberative process privilege."

While CIG is correct that the documents were a one-way communication, this does not mean they are not deliberative. As the State correctly notes, the documents were "intend-

---

**5.** CIG questions, in a footnote to the "Procedural Background" section of its brief, whether the procedural requirements for the assertion of a privilege, which we outlined in *Doe,* 721 P.2d at 626, have been met. We hold that the requirements were met. The documents for which the privilege was asserted were submitted under seal to the court for *in camera* review. The court was also supplied with affidavits by Stastny, Lethin, and Raga S. Elim (the Legislative Liaison subsequent to Lethin), based upon personal examination, specifically describing the documents and their intended use in the Governor's office. These are not the type of conclusory affidavits which the courts should guard against. While it is true that the superior court ultimately did not examine the documents submitted under seal, it did examine a memorandum from one department which had been leaked to CIG. This was not error, since an *in camera* examination of the documents is at the discretion of the trial court judge. *See Bureau of Nat'l Affairs,* 742 F.2d at 1498. Judge Pegues did not abuse his discretion in determining *in camera* review to be unnecessary where he had the affidavits and a representative memorandum which had already been made public.

ed for the governor's consideration in the development of his proposed ... legislative package." This satisfies the threshold deliberative test because the privilege is meant to further candor in the giving of advice or opinions to the chief executive, and the Governor need not respond to a document for candor to be desirable.

Finally, because the threshold requirements have been met (the material is predecisional and deliberative), we must weigh the "interest of the citizen in knowing what the servants of government are doing ... against the interest of the public in having the business of government carried on efficiently and without undue interference." *City of Kenai*, 642 P.2d at 1323.

The State argues that the need for carrying out business without undue influence is controlling. The State asserts:

> The governor must have the ability to obtain completely frank and candid advice from his cabinet and advisors; he must have the opportunity to evaluate ideas and fully consider their policy implications before he decides which of them will and which of them will not become part of his legislative ... proposals. In this give-and-take of the deliberative process, the governor must be "uninhibited by the danger that his tentative but rejected thoughts will become subjects of public discussion." *Doe*, 721 P.2d at 624, (citing Cox, *Executive Privilege*, 122 U.Pa.L.Rev. 1383, 1410 (1974) (footnote omitted)).

In response, CIG argues that

> [a] review of the proposed legislation, and particularly bills that were not introduced, would shed light on the needs of the agencies and might, in fact, generate valuable legislative debate or additional legislative proposals.

6. AS 37.07.050(a) states:
 Each state agency, on the date and in the form and content prescribed by the office, shall prepare and forward to the office and the legislative finance division
 (1) the goals and objectives of the agency programs, together with proposed supplements, deletions, and revisions;
 (2) its proposed plans to implement the goals and objectives, including estimates of

On the other hand, the public's need to protect the candor of its officials is almost non-existent with respect to the documents sought in this case. Would agencies be reluctant to submit the legislative proposals if they knew the proposals would be made public? Hardly. In fact, just the opposite is the case: the agencies actually hope that their proposals will become public as part of the Governor's legislative package.

■■ We believe that the proposals to the Governor, constituting advice as to what programs he should include in his legislative proposals for the year, fall squarely under the privilege and should be protected from disclosure. The Governor is not merely looking for an agency wish list to forward to the legislature. He is formulating his own political legislative package which will reflect his own priorities and agenda. In doing so, he must determine not only which of the agency proposals have merit but also which warrant the expenditure of his own political capital in their pursuit. This is one of the most sensitive and important functions that the Governor performs while in office, and the need for frank discussion of policy matters among the Governor's advisors is perhaps greater here than in any other area. We believe the need for effective decisionmaking in the Governor's office in the formulation of his legislative agenda is not overcome by CIG's desire to "shed light on the needs of the agencies." We thus hold that the legislative proposals at issue were properly withheld.

### b. *Budget impact memoranda*

The second set of documents CIG seeks are the budget memoranda sent from each department head to OMB in response to OMB's request. Alaska Statute 37.07.050 requires such a report.[6] The statute also states:

future service needs, planned methods of administration, proposed modification of existing program services and establishment of new program services, and the estimated resources needed to carry out the proposed plan;
(3) the budget requested to carry out its proposed plans in the succeeding fiscal year, including information reflecting the expenditures during the last fiscal year, those authorized for the current fiscal year, those proposed for the

All goals and objectives, plans, programs, estimates, budgets, and other documents forwarded to the office of management and budget by a state agency under this section are public information after the date they are forwarded.

AS 37.07.050(g).

■ We believe that the budget impact memoranda at issue here meet the threshold requirements for the privilege. They are predecisional because they were submitted before the Governor made his final determinations as to his proposed budget. *See Bureau of Nat'l Affairs,* 742 F.2d at 1497 (agency budget recommendations predecisional because President decides what requests to submit to Congress). They are deliberative because they were meant to be, and clearly were, a "direct part of the deliberative process," in allowing the Governor to hear the needs and opinions of each of the agencies which need to be accommodated in the budget. *See* Weaver & Jones at 296 (listing "an agency's budget request submitted to the Office of Management and Budget" as example of deliberative communication).

Since the documents are predecisional and deliberative, we would normally proceed to question whether the demonstrated need for disclosure outweighs the government's interests in confidentiality. However, in this case, the legislature has already weighed those interests, and resolved them in favor of public disclosure. AS 37.07.050(g).

As we have noted above, the deliberative process privilege is commonly accepted as having both common law and constitutional roots. Weaver & Jones 288–89. We accept for purposes of this argument the constitutional underpinnings of the doctrine. The State argues that the legislature can not override a constitutionally based deliberative process privilege:

> succeeding fiscal year, an explanation of the services to be provided, the number of total positions for all persons employed or under contract by the agency for personal services including those rendered for capital improvement projects, the need for the services, the cost of the services, and any other information requested by the office;
>
> (4) a report of the receipts during the last fiscal year, an estimate of the receipts during

The legislature cannot, by adopting a statute, negate the executive's deliberative process privilege. That the legislature serves as a representative of the public interest does not mean that it can define and limit the parameters of this constitutional privilege or the Governor's constitutional budgetary powers in any way it chooses.

The superior court accepted this position. We do not wholly agree.

■ The deliberative process privilege has never been held to be absolute. The strongest indication of its constitutional roots has come from the *Nixon* case, in which the United States Supreme Court recognized a qualified presumptive privilege "inextricably rooted in the separation of powers under the Constitution." 418 U.S. at 708, 94 S.Ct. at 3107. But the very holding of that case was that the executive privilege, even though constitutionally rooted, was not absolute and may be outweighed by the legitimate needs of a coordinate branch:

> In designing the structure of our Government and dividing it and allocating the sovereign power among three co-equal branches, the Framers of the Constitution sought to provide a comprehensive system, but the separate powers were not intended to operate with absolute independence.
>
> . . . .
>
> Since we conclude that the legitimate needs of the judicial process may outweigh Presidential privilege, it is necessary to resolve those competing interests in a manner that preserves the essential functions of each branch.

418 U.S. at 707, 94 S.Ct. at 3107. Thus we believe it is not sufficient to say that because the deliberative process privilege has constitutional underpinnings the legislature may never enact a statute which has the effect of

> the current fiscal year, and an estimate for the succeeding fiscal year;
>
> (5) a statement of legislation required to implement the proposed programs and financial plans;
>
> (6) an evaluation of the advantages and disadvantages of specific alternatives to existing or proposed program policies or administrative methods.

overriding the executive's request for secrecy.[7]

 Ordinarily, we would look with disfavor upon the legislature's attempt to compel public disclosure of predecisional and deliberative documents. But here, certain factors exist which the judiciary, in balancing the executive's assertion of the privilege against the legislature's attempt to override it, should take into account. Primary among them is that the legislature itself created the requirement for this type of report in AS 37.07.050. Forwarding the document thus is an official action, required by statute. The legislature has not only mandated that the reports be made and submitted to OMB, it has, in declaring the reports to be public, implicitly determined that the need for public disclosure outweighs any risk of lack of candor on the agencies' part.[8] This determination is entitled to significant weight, given the legislature's constitutional power to allocate executive department functions and duties among the offices, departments, and agencies of the state government.[9]

 The failure of the statute to affirmatively mention "impact memoranda" does not alter the analysis. The legislature clearly contemplated that there would be variations in OMB's requests to the agencies when it made public "[a]ll goals and objectives, plans, programs, estimates, budgets, *and other documents* forwarded" to OMB. AS 37.07.050(g) (emphasis added). The executive branch cannot avoid the disclosure requirements of subsection (g) by asking for the agencies' response to a proposed budget instead of for an estimated budget for the coming year.

We hold that the budget impact memoranda should have been disclosed.

### B. *Did Judge Pegues Err in Not Disqualifying Himself From the Case?*

 CIG argues that Judge Pegues should have disqualified himself from hearing this case because, as an Assistant Attorney General, he advised then-Governor Hammond that parts of AS 37.07.050 might have been unconstitutional. CIG claims this vio-

---

7. *See also* Archibald Cox, *Executive Privilege*, 122 U.Pa.L.Rev. 1383, 1407 (1974):
 But to demonstrate that the President should not be under an absolute duty to provide any and all information upon any and all occasions falls far short of making out the claim of President Nixon's attorneys that the President must have an absolute privilege upon any and all occasions to withhold whatever he wills. Both law and constitutional practice ought to be capable of recognizing, and making a more delicate adjustment in, the middle ground.
 And
 there are many cases in which Congress has the constitutional authority to institute measures that interfere with the "effective discharge of a President's powers".... It is entirely possible, therefore, that the Supreme Court, if squarely confronted with the question, might explain away the assertions in *United States v. Nixon* or confine them to situations in which there is no applicable legislation. *Id.* at 1435.

8. We recognize that *Bureau of National Affairs* reached the opposite conclusion with respect to similar documents. 742 F.2d at 1496–98. There, the United States Court of Appeals for the District of Columbia Circuit held that the EPA's assessment of its funding needs for the fiscal year were within the deliberative process privilege and could be withheld under FOIA Exemption 5. *Id.* However, in that case there is no indication that the interagency memoranda were required by any statute which also declared them available for public inspection.

9. This power is expressed in article III, sections 22 and 23 of the Alaska Constitution. These sections provide:

 SECTION 22. All executive and administrative offices, departments, and agencies of the state government and their respective functions, powers and duties shall be allocated by law among and within not more than twenty principal departments, so as to group them as far as practicable according to major purposes. Regulatory, quasi-judicial, and temporary agencies may be established by law and need not be allocated within a principal department.
 SECTION 23. The governor may make changes in the organization of the executive branch or in the assignment of functions among its units which he considers necessary for efficient administration. Where these changes require the force of law, they shall be set forth in executive orders. The legislature shall have sixty days of a regular session, or a full session if of shorter duration, to disapprove these executive orders. Unless disapproved by resolution concurred in by a majority of the members in joint session, those orders become effective at a date thereafter to be designated by the governor.

lates Canon 3C(1) of the Alaska Code of Judicial Conduct, which states that judges should disqualify themselves if their "impartiality might reasonably be questioned" because they have "a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts" or "served as a lawyer in the matter in controversy."

The document CIG references to support its claim is a 1978 letter to Governor Hammond from Attorney General Avrum M. Gross. The portion of the letter CIG cites apparently advises the Governor as to whether he should support the passage of AS 37.07.050. The letter states, in part:

> The bill provides for a number of capital budgeting and capital planning procedures which we are inclined to believe are impracticable, if not impossible. It provides in great detail how these matters will be accomplished and makes those details mandatory. In doing so, the bill appears to tread upon the executive's plenary power over the preparation of the state budget. Alaska Const., art. IX, sec. 12. For the most part, it should not have the effect of impairing that power, but to the extent that it may have that effect, it should be unconstitutional. In other words, the legislature cannot so hamstring the executive's preparation of the budget that it is no longer his but rather another's budget. The constitution places both the authority and the responsibility for the budget's preparation on one person, the chief executive.

CIG also claims that Judge Pegues "likely gained personal knowledge of disputed evidentiary facts."

Judge Pegues denied CIG's motion for disqualification. In his memorandum discussing his denial, Judge Pegues stated:

> My association with the Department of Law ended more than a decade ago. It is unlikely in the extreme that I possess any personal knowledge about any evidence that may be placed in dispute in this cause. My expertise does not fall in that area but rather in an overall knowledge of the process of the government of the State of Alaska and the law applicable to it. No appearance of impropriety can arise from that.

Judge Jahnke affirmed Judge Pegues's denial. Regarding the claim that Judge Pegues served as a lawyer on this case, Judge Jahnke pointed out that Judge Pegues's connection was old and tenuous:

> More that fifteen (15) years before this issue was raised, Judge Pegues was an assistant attorney general and authored a six-page letter to then-Governor Hammond reviewing a bill which contained the public records language that is in dispute in this case. However, the letter contains not one word addressing that section of the bill.

Regarding CIG's claim that Judge Pegues had personal knowledge of disputed evidence, Judge Jahnke found that CIG had not "identified what aspect of Judge Pegues' fund of knowledge is disputed by any party and relevant to the disposition of the case. As such, they have failed to identify any objective facts from which a fairminded person could conclude that an appearance of partiality on Judge Pegues' part exists."

 This court does not reverse a judge's decision not to disqualify himself based on the appearance of impartiality unless this court finds that he abused his discretion. *Long v. Long,* 816 P.2d 145, 156 (Alaska 1991). We cannot conclude that CIG, by asserting that the two superior court judges' "conclusions defy common sense and are simply wrong," meets the burden of showing an abuse of discretion. We hold that the facts found by Judge Jahnke are not clearly erroneous and that he did not abuse his discretion in denying the disqualification motion.

## IV. CONCLUSION

The superior court's summary judgment in favor of the State is AFFIRMED with respect to the legislative proposals sent to the Governor, and REVERSED with respect to the budget impact memoranda. The denial of CIG's Motion for Disqualification is AFFIRMED. The case is REMANDED to the superior court for proceedings consistent with this opinion.

MOORE, C.J., not participating.