*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| TIMOTHY W., | ) |
| | ) Supreme Court No. S-16222 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-12-06387 CI |
| v. | ) |
| | ) O P I N I O N |
| JULIA M., | ) |
| | ) No. 7196 – August 25, 2017 |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Frank A. Pfiffner, Judge.

Appearances: Meredith A. Ahearn, Law Office of Meredith Ahearn, Anchorage, for Appellant. Notice of nonparticipation filed by Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, and Bolger, Justices. [Carney, Justice, not participating.]

WINFREE, Justice.

## I. INTRODUCTION

The father in a custody, support, and visitation dispute maintains that the trial court was biased against him. The father challenges the court's: (1) denial of his judicial recusal motion; (2) decision to keep certain hearings open to the public; (3) sua sponte admission of evidence during its oral decision on the record; and (4) findings that the father had a history of domestic violence against a "domestic living partner"

requiring the court to impose limitations on his visitation. We affirm the trial court as to the first three matters, but we vacate the visitation order and remand for further proceedings, specifically, for findings on whether the acts of domestic violence occurred while a domestic living partnership was in effect.

## II.    FACTS AND PROCEEDINGS

Julia M. and Timothy W.,[1] both attorneys, married in 2005 and have three children, born in 2006, 2008, and 2010. The couple separated in 2011 and in April 2012 Julia filed for divorce.

Julia and Timothy initially appeared before Superior Court Judge Frank A. Pfiffner in May 2012, and in July entered into an agreement concerning custody, visitation, and support for their children. The agreement lasted through the fall; in December Timothy requested that Julia's sole legal custody and primary physical custody be modified.[2] The trial court denied that request because there had been no material change in circumstances. Timothy also sought to have his child support reduced or eliminated.[3] Julia in turn requested that the court impute income to Timothy and increase his child support.[4] Both parties requested changes to Timothy's visitation

---

[1]    We abbreviate the parties' names to protect their children's privacy.

[2]    *See* AS 25.20.110(a) ("An award of custody of a child or visitation with the child may be modified if the court determines that a change in circumstances requires the modification of the award and the modification is in the best interests of the child.").

[3]    *See* Alaska R. Civ. P. 90.3(c)(1) ("The court may vary the child support award . . . upon proof by clear and convincing evidence that manifest injustice would result if the support award were not varied.").

[4]    *See* Alaska R. Civ. P. 90.3(a)(4) ("The court may calculate child support based on a determination of the potential income of a parent who voluntarily and unreasonably is unemployed or underemployed. . . . Potential income will be based upon
(continued...)

schedule. The court held evidentiary hearings to resolve these and other motions in early 2013.

The trial court decided the visitation and child support issues in a March 2013 order. The court ruled that the previously established unsupervised visitation schedule would remain in effect, but instituted logistical guidelines to minimize conflict. Timothy's request for a hardship reduction in his child support was denied, and his payments were slightly increased based on a change in his net income. The court denied Julia's request to impute income to Timothy, finding he was not voluntarily and unreasonably underemployed. In reaching that determination the court made a number of harsh observations about Timothy's legal and parenting skills, business acumen, and mental health.

The initial 2012 divorce and custody proceedings had been, at the parties' request, confidential and closed to the public. After the March 2013 order — containing the trial court's harsh observations about Timothy's abilities and mental health — Timothy again moved to keep the proceedings confidential. Julia had not opposed keeping the earlier proceedings confidential, but she opposed this request. The court denied Timothy's motion and his subsequent motion for reconsideration.

In June 2014 Timothy filed a motion to disqualify Judge Pfiffner from further proceedings in the case. The disqualification motion "precede[d] a contemplated" motion to modify custody, visitation, and support. Timothy filed the disqualification motion because he believed "that a fair and impartial hearing cannot occur in respect of the contemplated [modification] motion." Timothy requested Judge Pfiffner's recusal in this case and "from any other matter where [Timothy is] participating as an attorney

---

[4]      (...continued)
the parent's work history, qualifications, and job opportunities.").

. . . (so as to avoid duplicative filings [in those other matters] that have the same or similar information)." Timothy argued that the March 2013 order demonstrated an impermissible bias against him, or that it at a minimum created the appearance of bias. Timothy also argued that by commenting on his abilities as an attorney the court was effectively acting "as a witness in the trial" requiring recusal on that basis as well.

Timothy's recusal motion was denied and referred for assignment to another superior court judge for review pursuant to AS 22.20.020(c).[5] Because Timothy was at that time participating in another case before Judge Pfiffner, requiring recusal from that case if Timothy's motion were granted, the order denying Timothy's recusal motion was served on counsel in that other case as well. The reviewing judge affirmed the order denying Timothy's request for recusal.

In September 2015 Julia filed a visitation modification motion. Alleging that Timothy's "mental health and personal circumstances and stability [had] deteriorated," she requested that Timothy be limited to supervised visitation with the children. The trial court held evidentiary hearings in January and February 2016. Both parties were self-represented at the first hearing; at the second Timothy was represented by counsel. At the first hearing Timothy again requested that the matter be confidential; Julia opposed the request. The court again ruled that the matter would remain open.

During these hearings one of Timothy's clients played a prominent role. Jackie[6] had been referred to him in November 2014 for assistance with ongoing legal issues. By early 2015 their attorney-client relationship had "evolved into a romantic, sexual relationship." At the second evidentiary hearing Julia called Jackie to testify

---

[5]    *See* AS 22.20.020(c) ("If a judicial officer denies disqualification the question shall be heard and determined by another judge assigned for the purpose by the presiding judge of the next higher level of courts . . . .").

[6]    A pseudonym is used to protect the client's privacy.

about her relationship with Timothy; Jackie's testimony was corroborated by text messages she and Julia had exchanged. Jackie testified to actions by Timothy that the trial court later determined constituted domestic violence.[7] As the trial court summarized: in one incident "[Timothy] ended up in [Jackie's] . . . locked house, uninvited, after he had swiped a credit card to jimmy the lock so that he could get in with his children . . . and [Jackie] came home and found him there and asked him what he was doing"; in a second incident when Timothy was at Jackie's home and she found text messages he had sent another woman, Jackie "became infuriated and ordered [Timothy] to leave . . . . [Timothy] initially . . . declined to do so and [Timothy] did not leave . . . until [Jackie] threatened [Timothy] with pepper spray and by calling the police." Finally, the court summarized Jackie's testimony concerning how Timothy "demanded sex" from her on numerous occasions in exchange for "continu[ing to do] a good job" on her legal work, and how she "allowed the sex to occur, even though she didn't always want it."

Several days after the second evidentiary hearing the trial court entered an oral decision with both Timothy's counsel and Julia in attendance. The court sua sponte entered into evidence the text messages Julia and Jackie had exchanged, noting that Julia had established a foundation for them during the evidentiary hearings. The court found that Timothy and Jackie were both "household members" and "domestic living partner[s]" for purposes of relevant domestic violence and visitation statutes. The court then found that Timothy had committed three acts of domestic violence against Jackie — two counts of criminal trespass and one of coercion. Because the court determined

---

[7]     *See* AS 25.20.110(c) ("[A] finding that a crime involving domestic violence has occurred since the last custody or visitation determination is a finding of change of circumstances under (a) of this section."); *see also* AS 25.20.110(a) ("An award of custody of a child or visitation with the child may be modified if the court determines that a change in circumstances requires the modification of the award and the modification is in the best interests of the child.").

that Timothy had committed three acts of domestic violence against a domestic living partner, the court applied the AS 25.24.150(j) presumption against supervised visitation and ordered Timothy to complete a parenting class and a batterer intervention program before he could resume unsupervised visitation.[8] Timothy appeals; Julia filed a notice of nonparticipation.

## III.    STANDARD OF REVIEW

We "review[] the decision on a motion to recuse for an abuse of discretion."[9] "[We] will not overturn a trial judge's recusal decision unless it is plain that a fair-minded person could not rationally come to that conclusion on the basis of the known facts."[10]

In determining whether to limit access to a case file under Alaska Administrative Rule 37.6, trial courts must weigh the public interest in disclosure against any legitimate interest in confidentiality.[11] We generally review such decisions for abuse of discretion.[12] "We will find an abuse of discretion when the decision on review is

---

[8]    *See* AS 25.24.150(j) ("If the court finds that a parent has a history of perpetrating domestic violence . . . the court shall allow only supervised visitation . . . conditioned on that parent's participating in and successfully completing an intervention program for batterers, and a parenting education program . . . .").

[9]    *Hanson v. Hanson*, 36 P.3d 1181, 1183 (Alaska 2001) (citing *Capital Info. Grp. v. Office of the Governor*, 923 P.2d 29, 41 (Alaska 1996)).

[10]    *Id.* (quoting *R.J.M. v. State*, 946 P.2d 855, 869-70 (Alaska 1997)).

[11]    *See* Alaska Admin. R. 37.6(b).

[12]    *See Luther v. Lander*, 373 P.3d 495, 506 (Alaska 2016) (indicating an Administrative Rule 37.6 balancing test decision is reviewed for abuse of discretion); *cf. Cooper v. Thompson*, 353 P.3d 782, 786 (Alaska 2015) (reviewing an Alaska Evidence Rule 403 balancing test decision for abuse of discretion).

manifestly unreasonable."[13]   Additionally, "[a]n abuse of discretion exists where the superior court 'considered improper factors in making its . . . determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others.' "[14]

"We review evidentiary rulings for abuse of discretion, although whether the trial court applied the correct legal standard presents a question of law that we review de novo."[15]

"We will reverse a superior court's custody and visitation determination 'only if the superior court has abused its discretion or if its controlling findings of fact are clearly erroneous.' "[16]   "We will conclude that a trial court's factual finding is 'clearly erroneous' when we are left with a 'definite and firm conviction that the . . . court has made a mistake.' "[17]   But "[w]e review de novo whether a superior court's findings satisfy the requirements" of statutes and rules.[18]

---

[13]   *Fink v. Municipality of Anchorage*, 379 P.3d 183, 188 (Alaska 2016) (quoting *Ranes & Shine, LLC v. MacDonald Miller Alaska, Inc.*, 355 P.3d 503, 508 (Alaska 2015)).

[14]   *Red Elk v. McBride*, 344 P.3d 818, 822 (Alaska 2015) (quoting *Siekawitch v. Siekawitch*, 956 P.2d 447, 449 (Alaska 1998)).

[15]   *State v. Carpenter*, 171 P.3d 41, 63 (Alaska 2007) (citing *Smithart v. State*, 988 P.2d 583, 586 (Alaska 1999)).

[16]   *Osterkamp v. Stiles*, 235 P.3d 178, 183 (Alaska 2010) (quoting *R.I. v. C.C.*, 9 P.3d 274, 277 (Alaska 2000)) (citing *Skinner v. Hagberg*, 183 P.3d 486, 489 (Alaska 2008)).

[17]   *Michele M. v. Richard R.*, 177 P.3d 830, 834 (Alaska 2008) (alteration in original) (quoting *Siekawitch*, 956 P.2d at 449).

[18]   *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*,
(continued...)

## IV. DISCUSSION

### A. The Trial Court Did Not Abuse Its Discretion By Declining To Recuse.

Timothy first argues that the trial court erred when it failed to recuse "and compounded this error by disseminating this information to opposition counsel in another case before the same trial court judge." Alaska Statute 22.20.020 lists nine grounds for disqualification; relevant to this appeal are AS 22.20.020(a)(3), disqualifying a judicial officer when "the judicial officer is a material witness," and AS 22.20.020(a)(9), requiring recusal when "the judicial officer feels that . . . a fair and impartial decision cannot be given."[19] In addition to actual bias, we have stated that under this statute "the appearance of partiality might be sufficient grounds for" disqualification[20] and that "[a] judicial officer must [recuse] in any proceeding in which the judicial officer's impartiality might reasonably be questioned."[21]

---

[18] (...continued)
235 P.3d 203, 210 (Alaska 2010) (citing *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 102 P.3d 932, 935 (Alaska 2004)); *see also Parks v. Parks*, 214 P.3d 295, 299-301 (Alaska 2009) (reviewing trial court finding of no "history of perpetrating domestic violence" under AS 25.24.150(g) for clear error but questions concerning proper application of underlying domestic violence statutes for legal error).

[19] Timothy also raised arguments under the Alaska Code of Judicial Conduct in his original disqualification motion, but he does not rely on the code on appeal. For purposes of evaluating Timothy's claim of bias and the appearance of partiality, no separate analysis of the Code of Judicial Conduct seems necessary as we already have incorporated relevant prescriptions from the code into our analysis under AS 22.20.020. *See, e.g.*, *Hanson v. Hanson*, 36 P.3d 1181, 1184 (Alaska 2001) (crafting rule statement under AS 22.20.020 employing language from Alaska Code of Judicial Conduct Canon 3(E)(1)(a)).

[20] *Amidon v. State*, 604 P.2d 575, 577 (Alaska 1979).

[21] *Hanson*, 36 P.3d at 1184 (citing *Amidon*, 604 P.2d at 578; *Perotti v. State*, (continued...)

We have held that "[t]o succeed on a motion to disqualify a judge for bias, the movant must show that the judge's actions 'were the result of personal bias developed from a nonjudicial source.' "[22] More specifically "a judge is not disqualified if the judge's 'knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings.' "[23] Finally, "[i]t should be kept in mind that a judge has as great an obligation not to [recuse], when there is no occasion to do so, as . . . to do so in the presence of valid reasons."[24]

### 1. Timothy abandoned his claim that the trial court was a material witness under AS 22.20.020(a)(3).

Timothy asserts that recusal was required because the trial court was "a material witness."[25] Timothy raised and argued this ground for recusal in his 2014 disqualification motion, and it was addressed in the denial order. But Timothy's appeal brief does not discuss the material-witness question, including why AS 22.20.020(a)(3) should apply in this case. A cursory point that is not further argued in the brief "will not

---

[21]    (...continued)
806 P.2d 325, 327 (Alaska App. 1991)).

[22]    *Id.* (quoting *Nelson v. Jones*, 781 P.2d 964, 972 (Alaska 1989)) (citing *Lacher v. Lacher*, 993 P.2d 413, 421 (Alaska 1999)).

[23]    *Id.* (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)).

[24]    *Amidon*, 604 P.2d at 577-78 (citing *In re Union Leader Corp.*, 292 F.2d 381, 391 (1st Cir. 1961); *Wolfson v. Palmieri*, 396 F.2d 121 (2d Cir. 1968)).

[25]    *See* AS 22.20.020(a)(3).

be considered on appeal."[26] We consider abandoned any claim that the trial court should have been disqualified as a material witness against Timothy.

### 2. The trial court did not abuse its discretion in determining there was no bias or appearance of bias under AS 22.20.020(a)(9).

Timothy more extensively develops his assertions of bias and appearance of bias under AS 22.20.020(a)(9). Timothy points to a number of harsh and unflattering findings the trial court made about Timothy's legal abilities and mental health in its March 2013 order. Timothy argues these cannot be considered "a measured finding and order from an objective finder of fact," and notes how damaging such statements are to his career as an attorney. He ultimately asserts that "[a]ny reasonable person reading the trial judge's orders would conclude that the judge was biased, or harbored some unknown animus toward [Timothy] not articulated in the order."

### a. Timothy does not establish that any alleged bias resulted from a nonjudicial source.

Timothy fails to address whether the court's "actions 'were the result of personal bias developed from a nonjudicial source,' "[27] or whether instead the court's "knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings."[28]

---

[26] *Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n.3 (Alaska 1991) (citing *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 528 (Alaska 1980); *Fairview Dev., Inc. v. City of Fairbanks*, 475 P.2d 35, 36 (Alaska 1970)); *see also Sykes v. Melba Creek Mining, Inc.*, 952 P.2d 1164, 1171 (Alaska 1998) ("[C]onclusory briefing of [a] point would warrant a finding of abandonment." (citing *Hitt v. J.B. Coghill, Inc.*, 641 P.2d 211, 213 n.4 (Alaska 1982); *Legge v. Greig*, 880 P.2d 606, 609 (Alaska 1994))).

[27] *Hanson*, 36 P.3d at 1184 (quoting *Nelson*, 781 P.2d at 972) (citing *Lacher*, 993 P.2d at 421).

[28] *Id.* (quoting *Liteky*, 510 U.S. at 551).

Timothy perhaps chose not to address this restriction on findings under AS 22.20.020(a)(9) because the trial court explicitly documented that its findings were rooted in testimony presented in the case and Timothy's own performance before the court. The court also explained that its findings "were not gratuitous statements intended to humiliate [Timothy]" but were instead "necessary findings to explain [the] decision." The findings were necessary because Julia "made a very strong argument that [Timothy] was unreasonably underemployed" for purposes of Rule 90.3(a)(4). Julia had demonstrated that Timothy "is highly intelligent and has an impressive academic resume. In the past [Timothy] has held jobs of significant difficulty, responsibility, and pay. . . . Yet, his income was only $11,135. . . . [Timothy's] woeful employment situation appeared unreasonable considering his intellect and education." The trial court amply demonstrated that its opinions "were properly and necessarily acquired in the course of the proceedings,"[29] and Timothy provides no argument on appeal to rebut this showing.

### b. Timothy does not demonstrate that the trial court's statements displayed an inability to render fair judgment.

Despite failing to address basic elements of the improper bias analysis, Timothy's appeal might nonetheless have merit were he to demonstrate that the trial court's statements were "so extreme as to display clear inability to render fair judgment."[30] He does not. Although the language may have been intemperate, the court's findings overall demonstrate a thorough and impartial consideration of the relevant facts.

Timothy asserts that "[a]ny reasonable person reading the trial judge's orders would conclude that the judge was biased, or harbored some unknown animus,"

---

[29]     *Id.* (quoting *Liteky*, 510 U.S. at 551).

[30]     *Id.* (quoting *Liteky*, 510 U.S. at 551).

asking rhetorically how any person "considering hiring him . . . [could] not be influenced by the judge's excessive comments about [Timothy's] legal ability, his character, or his mental stability." But that concern is properly considered under Alaska Administrative Rule 37.6 when determining whether to limit public access to the case file and hearings,[31] and Timothy raises this same interest in the confidentiality portion of his brief. The trial court considered Timothy's privacy interests when ruling on multiple requests to make the file and hearings confidential. Timothy offers no reason the impact on his privacy interests is relevant in the context of determining whether the court was impermissibly biased against him. As discussed above, the findings were "necessary . . . to explain [the] court's decision," and because they were necessary their inclusion provides no grounds to impute bias to the court — much less demonstrate the inability to render fair judgment — regardless of any detrimental impact on Timothy.

Timothy next faults the trial court for "liberally c[oming] to conclusions not in evidence," presumably referring to the unemployability finding. This argument is not further developed in his brief. But the court explained why it reached this conclusion: "[T]his court routinely helps pro se litigants by considering legal arguments that are warranted by the evidence even when those arguments are not presented by the litigants themselves." As noted above, Julia "made a very strong argument that [Timothy] was unreasonably underemployed," an outcome Timothy sought to avoid. Had the court not found that Timothy was unemployable as an attorney then "the court might well have determined that [Timothy] was voluntarily underemployed." Contrary to any suggestion that this finding demonstrates an inability to render fair judgment, the trial court

---

[31]     *See* Alaska Admin. R. 37.6(b) ("The court may limit public access . . . if the court finds that the public interest in disclosure is outweighed by a legitimate interest in confidentiality . . . .").

plausibly explained a desire to fully protect Timothy's legal interests and entered the finding in the course of ruling in Timothy's favor.

Timothy's arguments are notably undeveloped. Other than citing three cases for unobjectionable rule statements,[32] Timothy makes no attempt to provide authority for his claims of impermissible bias or to demonstrate any error that might have resulted from that alleged bias.[33] Timothy's argument under AS 22.20.020(a)(9) amounts to little more than an assertion that his own interpretation of the trial court's motives should be ascribed to all reasonable persons. We find this unpersuasive.

### 3. The trial court did not abuse its discretion by serving its order on opposing counsel in another case.

Timothy asserts that the bias he alleges above was "compounded . . . by disseminating th[e] information to opposition counsel in another case before the same trial judge." Timothy fails to substantially develop this argument in his brief, but when Timothy submitted his 2014 disqualification motion he was counsel of record in one other case before the same judge. The trial court noted that if it were to grant the motion it "would have to 'sua sponte' recuse [itself] from participating in" the other case and served the denial order on opposing counsel in that case as well.

---

[32]     *See Patterson v. Cox*, 323 P.3d 1118, 1123 (Alaska 2014) ("[E]ven an incorrect ruling[] is not evidence of judicial bias." (quoting *Peterson v. Swarthout*, 214 P.3d 332, 339 (Alaska 2009))); *Vaska v. State*, 955 P.2d 943, 945 (Alaska App. 1998) ("[J]udicial officers must . . . conduct themselves so as to avoid engendering reasonable suspicions of bias." (citing *Perotti v. State*, 806 P.2d 325, 327 (Alaska App. 1991))); *Perotti*, 806 P.2d at 327 (noting "the need to consider the appearance of impartiality").

[33]     *See Grace L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 329 P.3d 980, 989 (Alaska 2014) (rejecting bias claim in part because litigant "fail[ed] to show any way that the consideration of her requests . . . by the assigned judge affected the ultimate decision" or resulted in reversible error (citing Alaska R. Civ. P. 61)).

Although Timothy argues that this prejudiced him in the other case because opposing counsel "would likely determine its chances were better when litigating against [Timothy] before the court versus some other counsel," he fails to appreciate that his recusal request constituted an ex parte communication in the other case. Timothy hoped for "sua sponte" recusal from the other case so that Timothy could "avoid duplicative filings that have the same or similar information"; opposing counsel in that other case would not have considered a motion to disqualify the judge a duplicative filing and had a right to respond.

Alaska Rule of Professional Conduct 3.5(b) and Alaska Code of Judicial Conduct Canon 3(B)(7) forbid attorneys and judges from communicating ex parte unless authorized by law or exception. No such exception applies in this case.[34] By filing his request without notifying counsel in the other case Timothy might have "gain[ed] a procedural or tactical advantage," making the communication impermissible.[35] And even if an exception did permit the trial court to consider Timothy's recusal request ex parte, the court was still required to "take[] reasonable steps to notify all [opposing counsel] promptly of the substance of the ex parte communication and . . . allow[] them an opportunity to respond."[36] The court was obligated to notify all parties in the other case of Timothy's request.

---

[34]     *See* Alaska R. Prof. Conduct Canon 3.5(b); Alaska Code Jud. Conduct Canon 3(B)(7).

[35]     Alaska Code Jud. Conduct Canon 3(B)(7)(b)(ii).

[36]     Alaska Code Jud. Conduct Canon 3(B)(7)(b)(iii).

**B.     The Trial Court Did Not Abuse Its Discretion By Declining To Close The Hearings.**

Timothy next argues that the trial court erred by "fail[ing] to close the hearings." Whether to keep the case file confidential and the hearings closed arose several times during the proceedings. Timothy challenges only the court's decision to make the January and February 2016 modification hearings public, and he raises this claim only under Administrative Rule 37.6(b), which allows a court to limit public access if it "finds that the public interest in disclosure is outweighed by a legitimate interest in confidentiality, including but not limited to (1) risk of injury to individuals; [and] (2) individual privacy rights and interests."

Timothy sought to close the hearings because he believed "the trial judge's comments . . . would damage his ability to practice law in this community, and impact his ability to earn a living." He provides little argument in support of his claim that the trial court erred. Timothy notes that the court acknowledged "that family cases are often ugly with a fair amount of mudslinging going on and that this case was worse than most," and he argues that "if in the future any of his children chose to go into the court record, it would be detrimental to his relationship with [them]."

But Timothy provides no reason for us to reweigh the trial court's balancing of the competing interests in this case. And the court thoroughly explained its reasoning. The court believed that its initial decision to close the record had "been a license for bad behavior by both [parties]." As the court noted, Administrative Rule 37.5 creates a general rule that courts should provide for public access and "[t]here is a strong public policy in favor of public access to court records." The court emphasized that its foremost concern was whether the children would be hurt by making the record public, and it noted that neither party had been able to explain how that might occur. It observed that "mudslinging happens all the time in custody disputes" and that if it closed the record

every time it heard arguments along those lines then courts "wouldn't have any open proceedings."

The trial court considered the mandated factors and did not consider any improper factors.[37] Timothy simply disputes the outcome of the trial court's balancing test, providing no basis to conclude that the decision was manifestly unreasonable.[38] We hold that the trial court did not abuse its discretion by electing not to close the 2016 hearings.

## C. The Trial Court Did Not Err By Sua Sponte Admitting Into Evidence The Messages Between Julia And Jackie.

Timothy next argues that the trial court erred by sua sponte admitting into evidence email and text messages between Julia and her witness, Jackie. He claims "[t]here was no opportunity to test the validity or completeness of the messages . . . as they were admitted during the recitation of [the] trial court's order in the case." Timothy makes no claim that the messages were invalid or incomplete; he merely asserts they show only Julia's "blatant effort to manipulate and befriend the third party for [her] own agenda." He argues that the court's sua sponte admission of the communications into evidence during its decision on record infringed his due process rights to notice and opportunity to be heard, as well as his right of cross-examination.

Timothy's arguments have no merit, either procedurally or substantively. The messages were properly marked and included on the exhibit list prior to trial as

---

[37] *Cf. Red Elk v. McBride*, 344 P.3d 818, 822 (Alaska 2015) (quoting *Siekawitch v. Siekawitch*, 956 P.2d 447, 449 (Alaska 1998)) (noting when we will find an abuse of discretion).

[38] *See Fink v. Municipality of Anchorage*, 379 P.3d 183, 188 (Alaska 2016) ("We will find an abuse of discretion when the decision on review is manifestly unreasonable." (quoting *Ranes & Shine, LLC v. MacDonald Miller Alaska, Inc.*, 355 P.3d 503, 508 (Alaska 2015))).

required by Alaska Civil Rule 43.1(a); such exhibits "may be admitted into evidence upon . . . the court's own motion,"[39] which is precisely what occurred here. And Timothy did not timely object to admission of the messages.[40] This failure might reasonably be excused because, as Timothy points out, the messages were admitted during recitation of the court's order. But Timothy's counsel was present for the oral order, and the court provided Timothy's counsel an opportunity to ask questions and lodge objections; Timothy's counsel made no objection to admission of the evidence at that time. And Timothy fails even now to state any specific ground of objection to admission of the messages into evidence. As the court noted, the messages were relevant to Julia's case and a foundation was established when both Julia and Jackie "testified to the texting relationship and to the authenticity of the texts."

Beyond the procedural defects in his claim, Timothy's argument fails on the merits as well. Alaska Evidence Rule 103 requires that "a substantial right of the party" be affected before error can be found.[41] Timothy alleges infringements of his rights to notice, opportunity to be heard, and cross-examination. But Julia included the messages on her exhibit list, providing notice that she intended to introduce them. And although she failed to move for their admission into evidence, Julia relied heavily on the messages during her questioning of Jackie. Timothy's counsel questioned Jackie extensively about the messages on cross-examination, and during Julia's direct examination Timothy's attorney unsuccessfully challenged the foundation provided for the messages. There is no merit to Timothy's claim that he had "no opportunity to test the validity or completeness of the messages." We therefore reject his claim of error.

---

[39] Alaska R. Civ. P. 43.1(c).

[40] *See* Alaska R. Evid. 103(a)(1) (requiring a timely objection).

[41] Alaska R. Evid. 103(a).

**D.** **The Trial Court Made Insufficient Findings To Demonstrate Jackie Was A Domestic Living Partner When The Acts Of Domestic Violence Occurred.**

Timothy finally argues the trial court erred in concluding that he had "a history of perpetrating domestic violence against . . . a domestic living partner" under AS 25.24.150(g), and therefore erred in applying AS 25.24.150(j)[42] and limiting him to supervised visitation with his children until he completed a parenting class and a batterer intervention program. "A parent has a history of perpetrating domestic violence under [AS 25.24.150(g)] if the court finds that, during one incident of domestic violence, the parent caused serious physical injury or the court finds that the parent has engaged in more than one incident of domestic violence."[43]

Because there was no allegation that Timothy had caused anyone serious physical injury, to conclude that AS 25.24.150(j) applied the trial court had to find that Timothy had engaged in "more than one incident of domestic violence" against a "domestic living partner."[44] The term "domestic violence" is defined in AS 18.66.990,[45] and it includes both coercion and criminal trespass in the second degree (or an attempt to commit either offense) "by a household member against another household

---

[42]     *See* AS 25.24.150(j) ("If the court finds that a parent has a history of perpetrating domestic violence under (g) of this section, the court shall allow only supervised visitation . . . conditioned on that parent's participating in and successfully completing an intervention program for batterers, and a parenting education program . . . .").

[43]     AS 25.24.150(h).

[44]     *See* AS 25.24.150(g)-(h).

[45]     *See* AS 25.90.010 (referring to definition in AS 18.66.990(3)).

-18-                                                                                    **7196**

member."[46]  "Household member" is defined broadly under AS 18.66.990(5) and includes anyone who could be considered a "domestic living partner" under AS 25.24.150(g).  The term "domestic living partner" is not defined in statute.[47]

Accordingly, for purposes of this appeal, to find that AS 25.24.150(j) applied — limiting Timothy to supervised visitation until he completed parenting and batterer intervention classes — the trial court had to find that on more than one occasion Timothy committed, or attempted to commit, criminal trespass in the second degree and/or coercion against a "domestic living partner."[48]  The court found by a preponderance of the evidence that during the relevant period Timothy and Jackie were "domestic living partner[s]" under AS 25.24.150(g) and that Timothy had committed two counts of criminal trespass in the second degree and one count of coercion against her. Timothy disputes all three domestic violence findings and contends they "should not determine his custody and visitation."  We first address Timothy's arguments that the court erred in finding he committed three acts of domestic violence.  We next address his argument that the court erred in concluding those acts were committed against a "domestic living partner" within the meaning of AS 25.24.150(g).

---

[46]    AS 18.66.990(3); *see* AS 11.41.530 (coercion); AS 11.46.330 (criminal trespass).

[47]    *See* AS 25.24.150; AS 25.90.010.

[48]    *See* AS 25.24.150(g)-(h), (j); *see also* AS 18.66.990; AS 25.90.010.

**1.**     **The trial court did not err in determining Timothy had committed three acts of domestic violence.**

    **a.**     **A "household member" can commit trespass against another "household member."**

"A person commits the crime of criminal trespass in the second degree if the person enters or remains unlawfully . . . in or upon [a] premises . . . ."[49]  A person commits "domestic violence" by criminally trespassing "against another household member."[50]  Household members include people "who live together or who have lived together . . . who are dating or who have dated . . . [or] who are engaged in or who have engaged in a sexual relationship."[51]

Timothy's sole challenge to the trial court's two trespass findings is his argument that "household members" cannot commit criminal trespass against each other; if he "were a residen[t] of the household, as defined, then he could not commit trespass." This argument is flawed.  The legislature defined domestic violence as an offense committed "by a household member against another household member" and in the same section included criminal trespass as a listed offense.[52]  "Household members" is a broadly defined term of art including people who may, but need not, reside in the same home.[53]

---

[49]     AS 11.46.330(a).

[50]     AS 18.66.990(3).

[51]     AS 18.66.990(5).

[52]     AS 18.66.990(3).

[53]     *See* AS 18.66.990(5) (including, for example, people "who have engaged in a sexual relationship" and people "who are related to each other up to the fourth degree of consanguinity").

"Household members" under AS 18.66.990(5) can thus commit trespass against one another. And under the facts of this case, the trial court's finding that Timothy committed trespass against Jackie was not clearly erroneous even with the "household member" finding. There is ambiguity in the record concerning Timothy's and Jackie's living arrangements and whether he may at times have had a privilege to enter her home without her express permission.[54] Jackie testified that around the time Timothy used a credit card to enter her home, "[h]e would stay over quite often, so it's basically like he was living there." And Timothy notes Jackie's testimony that they both at times "carded the door" when Jackie would forget her keys inside the house. But Jackie also testified that Timothy "wasn't staying at my house" when he broke in. The court found Jackie was credible and accepted her testimony that Timothy was not invited or authorized to enter her house at that time without permission, notwithstanding his defense that "this was common practice between the two of them." Despite any ambiguity in the record, given Jackie's explicit testimony that Timothy broke into her home without her permission, we are not "left with a 'definite and firm conviction' "[55] that the court made a mistake in finding Timothy committed criminal trespass.

Nor is there any conflict between Timothy's "household member" status and the second criminal trespass finding, when Timothy refused to leave Jackie's home despite being ordered to do so. A person can commit criminal trespass despite being initially privileged to enter a premises by "fail[ing] to leave . . . after being lawfully

---

[54] *See* AS 11.46.350 (defining "enter or remain unlawfully" for purposes of criminal trespass to include situations where a person "enter[s] or remain[s] in or upon premises . . . when . . . not otherwise privileged to do so").

[55] *Michele M. v. Richard R.*, 177 P.3d 830, 834 (Alaska 2008) (quoting *Siekawitch v. Siekawitch*, 956 P.2d 447, 449 (Alaska 1998)).

directed to do so."[56] The court did not err by concluding Timothy had committed two counts of criminal trespass against a "household member" for purposes of the statutory domestic violence provisions. We note here, however, and discuss at length below, that the extent of Timothy's privilege to enter Jackie's home — or, relative to the second criminal trespass determination, to stay in Jackie's home in the face of an argument between them — does have implications for the trial court's "domestic living partnership" finding.

### b. The trial court's coercion finding was not clearly erroneous.

The trial court found by a preponderance of the evidence that Timothy committed the crime of coercion or attempted coercion under AS 11.41.530(a)(6):

> A person commits the crime of coercion if the person compels another to engage in conduct from which there is a legal right to abstain . . . by means of instilling in the person who is compelled a fear that, if the demand is not complied with, the person who makes the demand or another may
>
> . . . .
>
> (6) testify or provide information or withhold testimony or information with respect to a person's legal claim or defense.

Timothy begins his coercion challenge by noting "[t]here was no testimony that [he] threat[ened] physical violence," and there was likewise no testimony that Jackie "was actually coerced." We presume Timothy intends these to be claims of error. But AS 11.41.530(a)(6) does not require the threat of physical violence. And as the trial court noted, "[a]ttempts under Alaska law are the same as the act itself for purposes of

---

[56] AS 11.46.350(a)(2).

domestic violence."[57] Any suggestion that the trial court erred by entering a coercion finding in the absence of testimony on these points has no merit.

Timothy's more substantial argument against the coercion finding is that "[t]here was absolutely no evidence of intent." The trial court did not explicitly address the issue of intent; failing to enter an express finding on a critical issue requires a remand in some circumstances.[58] But the court did describe the conduct it concluded was coercion and cited Jackie's testimony and text messages as the evidence upon which it relied. The court found that when Timothy was working on Jackie's cases he "demanded sex" from Jackie for his work and "to continue doing a good job" and that she "allowed the sex to occur, even though she didn't always want it" so he would not carry through on his threats to stop working on her cases. The court explained that Timothy's conduct was coercion under subsection (a)(6) "because by saying to [Jackie] have sex with me or I won't work on your case or I won't work it well, [Timothy] threatened to withhold information from the [c]ourt to support [Jackie's] legal claims in her defense in her custody cases. That's coercion."

Other than the presumed claims of error dismissed above, Timothy does not challenge the trial court's conclusion that his conduct satisfied the elements of AS 11.41.530(a), and so we do not address those elements here. We address only Timothy's argument that there was no evidence he had the requisite intent. The coercion

---

[57]    *See* AS 18.66.990(3) (" '[D]omestic violence' . . . mean[s] one or more of the following offenses . . . or an attempt to commit the offense . . . .").

[58]    *See Mapco Express, Inc. v. Faulk*, 24 P.3d 531, 537-38 (Alaska 2001) (noting that Alaska Civil Rule 52(a) requires "remand for more detailed findings only if" a trial court's findings do not "(i) allow for meaningful appellate review and (ii) resolve all critical issues and disputes" (citing *Sullivan v. Subramanian*, 2 P.3d 66, 69-72 (Alaska 2000); *Beaulieu v. Elliot*, 434 P.2d 665, 670 (Alaska 1967))).

statute does not explicitly prescribe a culpable mental state.[59]  But AS 11.81.610(b) provides: "if a provision of law defining an offense does not prescribe a culpable mental state, the culpable mental state that must be proved with respect to . . . conduct is 'knowingly.' "  Under this default mental state the questions presented for our review become, in statutory terms, whether the trial court properly found that Timothy knew he was "compel[ling] [Jackie] to engage in conduct from which there [wa]s a legal right to abstain," and whether he knew he was accomplishing this "by means of instilling in [Jackie] a fear that, if the demand [were] not complied with," he might somehow sabotage her court cases.[60]

Alaska Civil Rule 52 generally requires a court to "find the facts specially and state separately its conclusions of law thereon."[61]  But Rule 52 "does not 'invariably require that the findings and conclusions be properly labeled, or even that express findings be made on all questions, so long as the record clearly indicates that the court considered the matter and resolved each critical factual dispute.' "[62]  Here ample evidence in Jackie's testimony and texting history supports a finding that Timothy knew he was compelling Jackie to engage in conduct — sexual activity — from which she had a legal right to abstain.  To compel is defined as "[t]o cause or bring about by force, threats, or overwhelming pressure."[63]  Jackie texted, and later affirmed in testimony, that Timothy demanded sexual favors, saying "after all I've done working your cases for free

---

[59]     *See* AS 11.41.530.

[60]     AS 11.41.530(a).

[61]     Alaska R. Civ. P. 52(a).

[62]     *Crittell v. Bingo*, 36 P.3d 634, 639 (Alaska 2001) (quoting *Urban Dev. Co. v. Dekreon*, 526 P.2d 325, 328 (Alaska 1974)).

[63]     *Compel*, BLACK'S LAW DICTIONARY (10th ed. 2014).

-24-                                                              7196

that's the least you can do." Text messages and testimony described how Timothy had spent "over 20 minutes . . . ranting as [Jackie] cried," complaining that Jackie refused sex despite the risk their relationship put him in. We conclude the trial court did not need to make an express finding that Timothy knew he was compelling Jackie; merely citing the relevant evidence and finding that Timothy had "demanded" sex allows for meaningful appellate review, provides "a clear understanding of the grounds upon which [the court] reached its decision,"[64] and "clearly indicates that the court considered the matter."[65] The grounds upon which the court reached its decision on this issue are clear; it felt Timothy had knowingly applied either threats or overwhelming pressure to coerce Jackie to engage in sex she transparently did not desire.

Under the trial court's unchallenged application of Timothy's conduct to the elements of the coercion statute,[66] to establish the requisite intent the court also had to find that Timothy knowingly compelled Jackie to engage in unwanted sex "by means of instilling in [her] a fear that, if the demand [were] not complied with,"[67] he might sabotage her cases.[68] The court found that Timothy communicated to Jackie: "have sex

---

[64]     *Price v. Eastham*, 128 P.3d 725, 727 (Alaska 2006) (citing *Ilardi v. Parker*, 914 P.2d 888, 892 (Alaska 1996)).

[65]     *Crittell*, 36 P.3d at 639 (quoting *Urban Dev. Co.*, 526 P.2d at 328).

[66]     The court's coercion finding rested on the conclusion that withdrawing legal services or sabotaging a client's case when the attorney knows the client cannot afford new counsel satisfies the coercion statute element of "withhold[ing] testimony or information with respect to a person's legal claim or defense." AS 11.41.530(a)(6).

[67]     AS 11.41.530(a).

[68]     Timothy would also have to know that Jackie was in some way dependent on him. There is no ambiguity in the record that Timothy knew Jackie was dependent on him because she could not afford a new attorney.

with me or I won't work on your case or I won't work it well." Jackie did not testify that Timothy had explicitly threatened to stop serving as her attorney; she testified he would demand sex for work he *had* done on her cases, evidently implying she should be grateful for that work and reciprocate by granting sexual favors. Although the court did not enter an explicit intent finding, there is only one plausible basis upon which it could have concluded Timothy coerced Jackie: it interpreted Jackie's testimony to indicate that Timothy was knowingly making an implicit threat to stop serving as her attorney if she did not comply with his demands. If there is only one plausible basis for a court's holding, we generally will not remand for failure to enter an explicit finding.[69]

Although the trial court did not enter an explicit intent finding, the evidence upon which it relied is more than sufficient to support an inference that Timothy knowingly coerced Jackie. And because there was only one plausible basis upon which the court could have determined Timothy's actions constituted coercion, the court's findings are "sufficient to give a clear understanding of the grounds upon which it reached its decision";[70] they "allow for meaningful appellate review" and "resolve all critical issues and disputes between the parties";[71] and the court discussed the conduct

---

[69] *See Mapco Express, Inc. v. Faulk*, 24 P.3d 531, 538 (Alaska 2001) (electing not to remand for an explicit finding because "it [was] obvious how the trial court resolved [the] conflict" between testimony and purportedly contradictory evidence, accepting the former as credible despite the conflict); *Frontier Saloon, Inc. v. Short*, 557 P.2d 779, 781 (Alaska 1976) (holding that remand for explicit findings was not necessary where it was "readily apparent that the trial court accepted" one party's testimony and rejected the other party's).

[70] *Price v. Eastham*, 128 P.3d 725, 727 (Alaska 2006) (citing *Ilardi v. Parker*, 914 P.2d 888, 892 (Alaska 1996)).

[71] *Mapco Express*, 24 P.3d at 537-38 (citing *Sullivan v. Subramanian*, 2 P.3d 66, 69-72 (Alaska 2000); *Beaulieu v. Elliot*, 434 P.2d 665, 670 (Alaska 1967)).

in question and the credibility of the witnesses in detail, demonstrating that it "exercised care in ascertaining the facts."[72] No remand is necessary for an explicit finding of intent, and the court's coercion finding was not clearly erroneous. But — as with the criminal trespass determinations — the court's coercion finding has some implications for the court's "domestic living partnership" findings, as discussed below.

> **2.** **The trial court did not clearly err by finding that Timothy and Jackie were "domestic living partners," but further findings are necessary to determine whether their partnership was in effect when the acts of domestic violence occurred.**

The presumption against supervised visitation contained in AS 25.24.150(j) applies when "a parent . . . has a history of perpetrating domestic violence against the other parent, a child, or a domestic living partner."[73] Because we affirm the trial court's findings that Jackie and Timothy were "household members" under AS 18.66.990(5) and that Timothy committed two counts of criminal trespass and one count of coercion against Jackie, Timothy had "a history of perpetrating domestic violence" for committing "more than one incident of domestic violence."[74] The dispositive question then becomes whether Timothy's history of domestic violence was "against . . . a domestic living partner," or whether the conduct was instead committed in the context of a relationship that the legislature did not intend courts to consider when applying the presumptions against custody and visitation found in AS 25.24.150(g) and (h).

---

[72] *Sarah D. v. John D.*, 352 P.3d 419, 429 (Alaska 2015) (quoting *Merrill v. Merrill*, 368 P.2d 546, 548 (Alaska 1962)) (citing Alaska R. Civ. P. 52(a); *John N. v. Desiree N.*, No. 1460, 2013 WL 1933133, at *5 (Alaska May 8, 2013)).

[73] AS 25.24.150(g); *see* AS 25.24.150(j).

[74] AS 25.24.150(h).

Timothy raises three arguments relevant to this question: (1) the crimes alleged were not committed against his family or his children and should have no bearing on his visitation rights; (2) the court impermissibly defined "domestic living partner" under AS 25.24.150(g) by importing the broad definition of "household member" from AS 18.66.990; and (3) alternatively, the court misinterpreted precedent and applied an overly broad definition of "domestic living partner" under AS 25.24.150(g).

### a. Criminal trespass and coercion are qualifying offenses under AS 25.24.150(g).

Timothy's first argument, that the crimes alleged "were completely irrelevant and not applicable to his family, especially his children," has no merit. He asserts that the coercion finding "did not constitute domestic violence in the sense that it did not have any relevance to his family or any pattern of behavior." He also notes that "[t]here was no evidence of any type of abuse by [Timothy] to his children or any person ever within his family circle."

When considering acts of domestic violence under AS 25.24.150(g) the only limitation is that the crimes be committed "against the other parent, a child, or a domestic living partner." We address below whether the trial court correctly determined that Jackie was a "domestic living partner." The other limitations Timothy attempts to import into the custody and visitation provisions are baseless. There is no special carve-out for crimes that do not include physical abuse; "domestic violence" in the custody and visitation provisions has the same definition as in the domestic violence and sexual assault provisions.[75] That definition includes criminal trespass and coercion, as well as other crimes that do not require showings of physical abuse, such as harassment and

---

[75] *See* AS 25.90.010 (referring to definition in AS 18.66.990(3)).

violating a protective order.[76]  Nor did the legislature limit the presumptions created in AS 25.24.150 to domestic violence directed against family members; as discussed above, in addition to another parent and children the legislature called for the presumption to apply when the violence is directed at a "domestic living partner."[77]  If Jackie was a "domestic living partner" when Timothy committed the acts of trespass and coercion, then those acts must be considered in applying the presumptions against custody and visitation contained in AS 25.24.150(g) and (j).  Timothy provides no basis for his assertion that he should be exempted from the otherwise clear statutory scheme.

>  **b.  The trial court did not impermissibly conflate "domestic living partner" with "household member."**

Timothy's second claim against the application of AS 25.24.150(j)'s presumption against unsupervised visitation is that the trial court impermissibly imported the AS 18.66.990(5) definition of "household member" to serve as the definition of "domestic living partner" under AS 25.24.150(g).  This claim is incorrect.  As noted above, no definition for "domestic living partner" is provided in Alaska's relevant statutes.[78]  Nor have we defined the term.[79]  Timothy is correct that the terms "domestic living partner" and "household member" were not intended to be coextensive — as we discuss further below[80] — and conflating the two terms would indeed be legal error.  But

---

[76]  *See* AS 18.66.990(3).

[77]  AS 25.24.150(g).

[78]  *See* AS 25.24.150; AS 25.90.010.

[79]  *See* Lisa Bolotin, Note, *When Parents Fight: Alaska's Presumption Against Awarding Custody to Perpetrators of Domestic Violence*, 25 ALASKA L. REV. 263, 281-84 (2008).

[80]  *See* discussion *infra* Section IV.D.2.c.

the trial court did not commit that error. The court properly employed the definition of "household member" provided by AS 18.66.990(5) when determining Timothy had committed crimes of domestic violence as defined by AS 18.66.990(3). When it came time to determine whether Timothy had committed those domestic violence crimes against a "domestic living partner" under AS 25.24.150(g), the court instead defined that term by reference to our holding in *Michele M. v. Richard R.* that acts of domestic violence against an ex-spouse can be considered.[81] The court did not treat "domestic living partner" and "household member" interchangeably; Timothy's assertion to the contrary fails.

                **c.**      **The trial court made insufficient findings to demonstrate Jackie was a domestic living partner at the time the acts of domestic violence were committed.**

Timothy's final claim is that the trial court erred by misinterpreting precedent and applying an overly broad definition of "domestic living partner." We have not yet ruled whether "domestic living partner" under AS 25.24.150(g) should extend beyond spouses and ex-spouses and also include relationships such as cohabitation.[82]

                **i.**      **The trial court did not clearly err by finding that Timothy and Jackie were "domestic living partners" for some unknown period.**

A helpful discussion of the presumptions against custody and visitation created by AS 25.24.150 can be found in Lisa Bolotin's law review note *When Parents Fight: Alaska's Presumption Against Awarding Custody to Perpetrators of Domestic*

---

[81] 177 P.3d 830, 836-38 (Alaska 2008) (holding in custody dispute that father's alleged domestic violence in an earlier marriage must be considered for purposes of AS 25.24.150(g)-(i)).

[82] *See* Bolotin, *supra* note 79, at 283-84.

*Violence*.[83] Bolotin presents two "possible interpretation[s] of 'domestic living partner' ": a broad interpretation with " 'domestic living partner' having the same meaning as 'household member' " under AS 18.66.990(5), and a narrower interpretation not clearly defined but requiring that the victim actually live with the perpetrator.[84]

In support of the argument that "domestic living partner" might plausibly have the same meaning as "household member" under AS 18.66.990(5), Bolotin points to legislative history indicating that the sponsor of House Bill 385, creating the AS 25.24.150 presumptions against custody and visitation, "intended to adopt the approach of the Model Code of the Family Violence Project of the National Council of Juvenile and Family Court Judges."[85] Bolotin correctly notes that "[t]he Model Code is written to raise the presumption wherever 'domestic or family violence' has occurred."[86]

But despite any legislative history to the contrary, the language of the statute and the context in which it is employed leave little room for such an interpretation.[87] If the legislature intended that all acts of domestic violence be considered when applying the AS 25.24.150 presumptions then it could simply have left out the requirement that the domestic violence be perpetrated "against the other parent,

---

[83]    *See generally id.*

[84]    *Id.* at 281-84.

[85]    *Id.* at 282 (citing Hearing on H.B. 385 Before the H. Judiciary Comm., 23d Leg., 2d Sess. 0622 (Mar. 1, 2004) (statement of Rep. Lesil McGuire, Sponsor of H.B. 385)).

[86]    *Id.* (citing MODEL CODE ON DOMESTIC & FAMILY VIOLENCE § 401 (1994)).

[87]    *See City of Dillingham v. CH2M Hill Nw., Inc.*, 873 P.2d 1271, 1276 (Alaska 1994) ("The plainer the meaning of the statute, the more persuasive any legislative history to the contrary must be." (citing *Peninsula Mktg. Ass'n v. State*, 817 P.2d 917, 922 (Alaska 1991))).

a child, or a domestic living partner."[88]  Indeed, the model code that H.B. 385's sponsor referred to in committee took such an approach, applying the presumption in every proceeding where the court makes a determination that "domestic or family violence has occurred."[89]  But our legislature limited what instances of domestic violence could be considered.[90]  Ruling that "domestic living partner" under AS 25.24.150 and "household member" under AS 18.66.990(5) have the same meaning would render the legislature's modifying language superfluous, as "the other parent, a child, [and] a domestic living partner" are already included under any plausible interpretation of "household member."[91]  And although the bill's sponsor indicated an intent for Alaska to adopt the above-referenced model code, that comment was made when introducing the entirety of the bill, not during any discussion of the particular language, or even subsection, at issue here.[92]  We therefore conclude that "domestic living partner" must have a narrower definition than "household member" and that any legislative history supporting an interpretation to the contrary is insufficient to overcome the statute's clear meaning.[93]

---

[88]     AS 25.24.150(g).

[89]     Bolotin, *supra* note 79, at 273 (citing MODEL CODE ON DOMESTIC & FAMILY VIOLENCE § 401 (1994)).

[90]     *See* AS 25.24.150(g).

[91]     *See* AS 18.66.990(5); AS 25.24.150(g).

[92]     *See* Hearing on H.B. 385 Before the H. Judiciary Comm., 23d Leg., 2d Sess. 0622 (Mar. 1, 2004) (statement of Rep. Lesil McGuire, Sponsor of H.B. 385).

[93]     Our analysis here follows only the clear statutory language and structure, but we observe the legislature may have had good policy reasons to set some limitations on what acts of domestic violence should be considered for purposes of the AS 25.24.150 custody and visitation presumptions. *See Cooper v. District Court*, 133 P.3d 692, 707-08 (Alaska App. 2006) (discussing how, "[b]ecause the definition of

(continued...)

Because "domestic living partner" must be a narrower term than "household member," the questions then become how narrow that definition should be and whether Jackie should qualify. Bolotin notes that prior to 2008 "all appellate cases that applied [AS] 25.24.150(g) . . . concerned violence between parents of the child whose custody was in dispute," but that our 2008 *Michele M.* case "clarifies that a spouse who is not the parent of the child also qualifies as a 'domestic living partner.' "[94] In *Michele M.*, however, it was unclear whether the ex-wife qualified "merely because she had been married to [the father], or because she had lived with him after" the child at issue in the custody dispute was born.[95]

An accurate assessment of the state of the law after *Michele M.* and at the publication of Bolotin's note in 2008, therefore, would conclude there was no indication that "domestic living partner" must have the same meaning as "household member" under AS 18.66.990(5), but it must include ex-spouses with whom the perpetrator has resided. Subsequent to publication of Bolotin's article all appellate cases applying AS 25.24.150(g) have continued to concern "violence between parents of the child whose custody was in dispute,"[96] with one exception where we provided relevant dictum.

---

[93]     (...continued)
'crime involving domestic violence' is so expansive[,] . . . there will be many cases in which, even though the defendant's crime may qualify as a 'crime involving domestic violence', it makes no sense" to require a batterer intervention program).

[94]     Bolotin, *supra* note 79, at 282-83 (citing *Michele M. v. Richard R.*, 177 P.3d 830, 837-38 (Alaska 2008)).

[95]     *Id.* at 283; *see Michele M.*, 177 P.3d at 837-38.

[96]     Bolotin, *supra* note 79, at 282-83 (citing *Puddicombe v. Dreka*, 167 P.3d 73 (Alaska 2007); *O'Dell v. O'Dell*, No. S-12097, 2007 WL 1378153 (Alaska May 9, 2007)).

In *Harris v. Governale*[97] we considered whether domestic violence between a father and an ex-girlfriend should be factored in to a custody determination — involving the father and the mother of another child — under either the general best interests analysis[98] or when applying the presumption against custody in AS 25.24.150(g). In that case the father and the ex-girlfriend were not living together at the time of the custody trial, but they "had lived together for four years, had a child together, and continued to share major expenses while living apart."[99] We held that the trial court should have considered a domestic violence incident between them when conducting the best interests analysis but that the presumption in subsection .150(g) was not triggered because it was unclear whether the father or the ex-girlfriend had been the perpetrator.[100] Although the presumption could apply only when the parent seeking custody was the perpetrator, we accepted that it would have been triggered had the trial court found that the ex-girlfriend was the victim of assault by the father.[101] The conclusion that subsection .150(g) would have applied was only dictum, but the reasoning augments the holding in *Michele M.* and indicates that the term "domestic living partner" includes not only ex-spouses, but also other persons with whom the parent seeking custody had resided and had a child.

In this case the trial court interpreted *Michele M.* to mean that "a domestic living partner includes a former girlfriend," but made no reference to *Harris*. Timothy

---

[97]    311 P.3d 1052, 1057-59 (Alaska 2013).

[98]    *See* AS 25.24.150(c)(7).

[99]    *Harris*, 311 P.3d at 1057.

[100]    *Id.* at 1058.

[101]    *Id.*

correctly points out that the court's interpretation of *Michele M.* is overbroad, as the victim in that case was an ex-wife, not merely an ex-girlfriend.[102]   But Timothy does not address *Harris* either, nor explicitly argue that "domestic living partner" should include only spouses and ex-spouses; he does suggest that the definition should require that the victim and perpetrator be "partners in the sense of family with children" and "reside together."

        We are therefore presented with three questions in determining how "domestic living partner" should be interpreted and applied in this case:  (1) should the term include only spouses and ex-spouses? (2) should the term require that the perpetrator and victim have a child together? and (3) should the term require that the perpetrator and victim reside together?

        The answer to the first question is no.   The plain meaning of the term "domestic living partner" supports this conclusion.[103]  Had the legislature wished courts to consider only spouses and ex-spouses then it easily could have employed that more familiar language, rather than the term of art "domestic living partner."[104]  Additionally, as noted above, our precedent does not foreclose an interpretation extending beyond ex-spouses, and the dictum in *Harris* suggests that we have been prepared to include ex-girlfriends (or ex-boyfriends) in the definition in the past.[105]

        The answer to the second question is likewise no — there is no requirement that the perpetrator and the victim have a child together as Timothy seems to suggest.

---

[102]   *Michele M. v. Richard R.*, 177 P.3d 830, 831, 837-38 (Alaska 2008).

[103]   AS 25.24.150(g).

[104]   *See* AS 25.24.150(g).

[105]   *See Harris*, 311 P.3d at 1058.

Nothing either in the statute or in our precedent indicates that such a condition is necessary.[106]

The answer to the third question is yes; there is a requirement that the perpetrator and victim lived in the same household, but "lived together" must be given a fairly relaxed meaning. This requirement is suggested by a plain reading of the term "domestic living partner," relying on common public definitions in place at the time AS 25.24.150(g) was enacted:[107] "domestic" refers to "the family or the household";[108] "living" appears to be a gerund formed from the verb "live" that here employs the meaning "to occupy a home" or "cohabit";[109] and the meaning of "partner" here seems to be either "persons who are married or who live together" or people "who share[] . . . in a venture with shared benefits and shared risks."[110] "Domestic partnership" is defined as "[a] nonmarital relationship between two persons . . . who live together as a couple for a significant period of time."[111] In combination these words strongly suggest a requirement that the relationship between the perpetrator and the victim not be casual, and that they reside in the same household on a basis that entails some commitment.

---

[106] *See* AS 25.24.150; *Harris*, 311 P.3d at 1057-58; *Michele M.*, 177 P.3d at 831, 837-38; Bolotin, *supra* note 79, at 281-84.

[107] *See* Ch. 111, § 5, SLA 2004 (adding subsections .150(g)-(k) to AS 25.24.150).

[108] *Domestic*, BLACK'S LAW DICTIONARY (8th ed. 2004).

[109] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1323 (Philip Babcock Gove et al. eds., 2002).

[110] *Partner*, BLACK'S LAW DICTIONARY (8th ed. 2004).

[111] *Domestic Partnership*, BLACK'S LAW DICTIONARY (8th ed. 2004).

An argument against such an interpretation is that although a plain reading of the term "household member" suggests that the perpetrator and victim reside together, the definition provided in AS 18.66.990(5) extends well beyond any such constraint. However, as noted above, "household member" and "domestic living partner" should not be given the same meaning; if the legislature did not intend to place additional constraints on the presumptions found in AS 25.24.150(g) and (j), then it would not have added language requiring that the domestic violence be perpetrated against "the other parent, a child, or a domestic living partner."[112] And whereas the legislature provided a statutory definition of "household member" that explicitly expanded the term beyond its plain meaning, the legislature provided no such definition for "domestic living partner," suggesting that the term should be interpreted more in accordance with its plain meaning.[113]

Although the plain meaning of "domestic living partner" suggests some requirement that the perpetrator and victim did in fact live together, we do not believe that requirement can be construed too strictly. As Bolotin highlights, legislatures enacting presumptions against custody and unsupervised visitation for perpetrators of domestic violence were generally motivated by social science findings indicating that "[c]hildren who witness domestic abuse" are more likely to experience a variety of mental and physical health problems.[114] Within the context of serious and committed relationships, if courts were to interpret the term "domestic living partners" as exclusively requiring a traditional household where the partners share one home on a more or less permanent basis, then cases of domestic violence where the partners have

---

[112] AS 25.24.150(g).

[113] *See* AS 18.66.990(5); AS 25.24.150(g).

[114] Bolotin, *supra* note 79, at 270-73.

unorthodox housing arrangements — for example, retaining their own homes and taking turns staying at each or living in different cities and regularly visiting each other — might slip through the cracks.  The sponsor of H.B. 385 was concerned that "[w]hen children witness violence in the home, they have been found to suffer many of the symptoms that are experienced by children who are directly abused."[115]  We conclude that in adopting the term "domestic living partner" to address the broad problem of children witnessing domestic abuse, the legislature intended to capture violence that took place within the context of relationships where partners spend a significant amount of their time in a shared domestic environment.

It was not clearly erroneous to find Timothy and Jackie's relationship fell within this definition.  Jackie testified that although Timothy "had his own place[ h]e would stay over quite often, so it's basically like he was living" at her home for the better part of a year.  Timothy "talk[ed] about marriage," "spent time with [Jackie's] children, and when he had visitation with his own children . . . those children also spent time at [Jackie's] home and with [Jackie's] children."  Jackie responded affirmatively when asked whether Timothy had "been essentially living with" her from the time they began dating, and she testified that one of her children "referred to [Timothy] as Daddy." Jackie's and Timothy's children spent a significant amount of time together during the period the adults were dating.  In short, although Timothy and Jackie maintained separate residences, their lives were clearly very intertwined during some part of their relationship, when they generally lived and slept in the same home and incorporated their children into their shared lives.  Jackie and Timothy spent a significant amount of their time in a shared, marriage-like, domestic environment; we thus affirm as not clearly

---

[115]    Rep. Lesil McGuire, Sponsor Statement for H.B. 385 (Mar. 15, 2004), http://www.akrepublicans.org/mcguire/23/spst/mcgu_hb385.php.

erroneous the trial court's general finding that Jackie was Timothy's "domestic living partner" for purposes of AS 25.24.150(g).

> ### ii. Additional findings are necessary to determine whether Timothy and Jackie were "domestic living partners" when the crimes of domestic violence occurred.

Our inquiry, however, does not end there. The trial court did not enter findings on when Jackie's status as a "domestic living partner" with Timothy began and ended. As discussed earlier, given the extremely broad definition of "household member" provided in AS 18.66.990(5), Timothy's argument that "household members" cannot commit trespass against each other is incorrect. But there is considerable tension between findings that two people are "domestic living partners" and that one committed trespass against the other during that relationship. Alaska Statute 11.46.330 prohibits a person from "enter[ing] or remain[ing] unlawfully in or upon premises"; AS 11.46.350(a)(1) defines "enter or remain unlawfully" to include situations where a person "enter[s] or remain[s] in or upon premises . . . when the defendant is *not otherwise privileged to do so*." (Emphasis added.) People considered "domestic living partners" under AS 25.24.150(g) generally would be expected to share privileges to enter each other's premises; conversely, if they do not share those privileges, then perhaps they should not be considered "domestic living partners" under AS 25.24.150(g). The term "domestic living partner" is descriptive, not prescriptive, and we do not suggest that status *confers* a privilege to enter a partner's home, nor a privilege to remain there "after being lawfully directed to" leave.[116] We instead question whether an individual who

---

[116] AS 11.46.250(a)(2). *Cf. State v. Lilly*, 717 N.E.2d 322, 327 (Ohio 1999) ("A majority of other jurisdictions that have addressed th[e] issue have found that the entry of an estranged spouse upon the property of the other spouse constitutes an
(continued...)

does not enjoy such a privilege or whose privilege has terminated — equivalent to an "estranged spouse" — appropriately can be considered a "domestic living partner." Every case turns on its own facts, but we question whether that designation can be applied if the unwelcome "partner" has no privilege to enter.

The context of this case raises at least two scenarios where this tension presents itself. The trial court's first trespass finding involved Timothy, with his children present, using a credit card to enter Jackie's home without her permission. Although Jackie testified that it was "basically like [Timothy] was living" at her home during that period, she also testified that she considered his entry unauthorized because "he wasn't staying at my house at that point in time." The court made no explicit findings on when their status as "domestic living partners" began or ended; it is therefore not clear whether the court felt they were active "domestic living partners" when the trespass occurred, or whether they had achieved "domestic living partner" status and it had not terminated simply because Timothy was no longer authorized to enter Jackie's home (assuming he ever had been granted that privilege). But more importantly the court's lack of findings leaves unexplained how Timothy and Jackie could be domestic living partners at a time Timothy was not privileged to enter Jackie's home.

The trial court's findings concerning the second trespass likewise fail to resolve this tension. In that instance Timothy was at Jackie's residence when she became infuriated and ordered him to leave; Timothy "declined to do so . . . until [Jackie] threatened [him] with pepper spray and by calling the police." Certainly there may be factual scenarios where courts will find both that two people are "domestic living partners" and that one of them committed trespass by refusing to leave the other's

---

[116]    (...continued)
unauthorized entry to support charges of trespass and burglary."); *State v. Parvilus*, 332 P.3d 281, 286 (N.M. 2014) (also collecting cases).

-40-                                              **7196**

premises after being directed to do so. But the trial court's limited findings do not demonstrate whether those circumstances apply here.

Because it is unclear whether Timothy and Jackie were "domestic living partners" when the trespasses occurred, we must also question whether they were "domestic living partners" when the other act of domestic violence occurred. We conclude it is necessary to remand so the court can determine: (1) the specific timing of Timothy and Jackie's domestic living partnership; (2) the specific arrangements they had during that domestic living partnership regarding movement between houses — including any express, implied, or apparent authority each had to enter the other's house during the domestic living partnership; and (3) how the timing and nature of these arrangements relate to the criminal trespass and coercion findings.

In remanding we decline to establish any precise delineations on when a domestic living partnership must be found to begin and end. We have established that the status of "domestic living partner" is achieved whenever partners spend a significant amount of their time with each other — and when applicable, with their children — in a shared, marriage-like, domestic living environment. There will be cases when domestic living partnerships — like marriages — disintegrate, although cohabitive living arrangements may stay the same for some period of time. Trial courts need to be attentive to the facts of each case to determine when couples no longer are domestic living partners but rather are merely household members. We defer any decisions on the temporal limitations of domestic living partnerships to future cases where the issue is more squarely presented.

## V.    CONCLUSION

We VACATE the trial court's decision applying AS 25.24.150(j) and REMAND for further proceedings consistent with this opinion. We AFFIRM all other aspects of the trial court's decision.